CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 27 2013

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| STEVEN CUMBERBATCH, JR., | ) Civil Action No. 7:12cv00256 |
| Petitioner, | ) |
| v. | ) 2254 MEMORANDUM OPINION |
| HAROLD W. CLARKE, | ) |
| Respondent. | ) By: Samuel G. Wilson<br>) United States District Judge |

This is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 by petitioner Steven Cumberbatch, Jr., challenging his conviction and sentence in the Circuit Court for the City of Danville, Virginia, for the second-degree murder of Karen Adkins, who police found on July 22, 2008, shortly before she died from twenty-three stab wounds. Cumberbatch raises various ineffective-assistance claims, a sufficiency-of-the-evidence claim, and several claims grounded on state law. The matter is currently before the court on the respondent's motion to dismiss. The court finds that the Supreme Court of Virginia adjudicated Cumberbatch's ineffective-assistance and sufficiency-of-the-evidence claims on the merits and in a manner not contrary to clearly established federal law or based on an unreasonable determination of the facts. In addition, the court finds that Cumberbatch's state-law-based claims are not cognizable in habeas. Accordingly, the court grants the respondent's motion to dismiss.[1]

---

[1] The respondent concedes that all of Cumberbatch's claims are exhausted. See 28 U.S.C. § 2254(b)(1) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless . . . the applicant has exhausted the remedies available in the courts of the State . . . .").

# I.

In 2008, a Virginia grand jury indicted Cumberbatch for the July 22, 2008, first-degree murder of Karen Adkins. On January 13, 2009, Cumberbatch appeared in the Circuit Court for the City of Danville for a motions hearing prior to his jury trial on that charge. At that hearing, Cumberbatch's counsel argued that Adkins' statements to police and emergency personnel, which she made after sustaining twenty-three stab wounds, and which identified Cumberbatch as the person who stabbed her, should be excluded as hearsay. Counsel also asked the court for a continuance because his wife was sick, and to permit Cumberbatch to locate two additional witnesses. After hearing testimony from three witnesses and argument from both sides, the court denied the continuance and decided that it would admit Adkins' statements as dying declarations under Virginia law. Trial began the next day. On the first day of the two-day trial, the Commonwealth called thirteen witnesses, who together told the story of Adkins'[2] ill-fated relationship with Cumberbatch.

Cumberbatch and Adkins began dating in October of 2007. According to Adkins' mother, Lily Baggerly, the couple spent "every night" together, but fought frequently. On the afternoon of her stabbing, Adkins picked up her cousin, Byron Coles, from work and took him to a house on Danville's Richmond Avenue to play cards and spend time with friends. Soon after they arrived, Cumberbatch made an unexpected visit to the Richmond Avenue house and asked to speak to Adkins. After a five-minute conversation outside the house, Cumberbatch left, and Adkins came back inside looking upset. Soon after, Adkins and Coles went to McDonalds, where they sat in the parking lot and ate. While they sat, Adkins received and ignored two or

---

[2] The decedent's name is spelled "Adkins" in the trial transcript and "Atkins" in other court documents. The court will use the spelling from the transcript. A similar question exists regarding whether Shannon Green's last name ends with an "e." The court will adhere to the spelling in the transcript: "Green."

three calls from Adkins' old cell phone, a cell phone that Cumberbatch had started to use. (Coles testified that he used to call Adkins at that cell-phone number, that Adkins had gotten a new phone, and that a few weeks before Adkins' death he tried calling the old number and Cumberbatch answered.) After they finished eating, Adkins and Coles visited another friend's house, where they sat on the porch and talked. There, Adkins received another three or four calls from the same cell-phone number, only one of which she answered. On the ride home, Adkins received still more calls from the same number.[3] Adkins dropped off Coles at approximately 8:15 p.m.

A little after 9:00 that evening, Yolanda Boyd and Shannon Green, roommates living at 121 Hamlin Avenue in Danville, heard someone shouting for help and banging on their front door. Boyd looked out the window and saw a stranger standing on her front porch "bleeding real bad." (Tr. 232.) Boyd called 911, looked back outside, and saw that the stranger, Karen Adkins, had collapsed. Boyd also saw an "SUV, like, a Mountaineer or something" parked across the street, facing her house, with the headlights off. Boyd saw a heavy-set black man sitting in the vehicle, wearing "square glasses" and a Bluetooth earpiece. She later identified Cumberbatch as the driver.[4] In short order, the vehicle drove away.

Seconds before Boyd called 911, Adkins had made her own 911 call. That call summoned a nineteen-year veteran of the Danville police force, Officer Samantha Luck, to Boyd's residence. When Luck "pulled up in front of the residence . . . it appeared as though [there] was a slaughtered pig lying on the front porch." (Tr. 196.) What Luck actually saw was

---

[3] Phone records Cumberbatch included with his petition indeed show ten calls from the number on July 22, 2008.

[4] The Danville Police Department arranged a photo lineup, and Boyd picked Cumberbatch from the lineup as the man in the truck. Boyd also identified Cumberbatch in the courtroom. Green's testimony nearly mirrored Boyd's, but she was not as certain about the identity of the SUV driver.

3

Adkins' body, bleeding from twenty-three stab wounds to her face, neck, torso, arms, and legs.[5] When Luck got to the front porch, she asked Adkins, "Who did this?" (Tr. 197.) With some effort, Adkins said that her boyfriend, Steve Cumberbatch, had done it in the empty house next door. At the hospital, respiratory therapist Cynthia Driggers asked Adkins the same question and received essentially the same answer: "My boyfriend." (Tr. 224.) Adkins came out of surgery around 1:00 a.m on July 23rd. She died five hours later.

A few hours after Adkins left surgery, Cumberbatch knocked on his friend Gerald Clements' front door. Clements, who had been drinking heavily, let Cumberbatch into the house and went back to bed. Around 9:30 that morning, occasional houseguest Tammy Walker stopped by Clements' home. As Clements, Walker, and Cumberbatch talked, Cumberbatch mentioned that "he was in trouble and he needed some money to get out of town." (Tr. 335.) According to Walker, Cumberbatch said, "I did something, f'd up. I did something terrible." (Tr. 344.) Walker asked him what he had done, but he told her, "I can't say" (Tr. 345.) and asked for a change of clothes. Walker found a pair of shorts and a t-shirt, gave them to Cumberbatch, and left to go to the store. At the store, she overheard others talking about the previous night's murder. When she got back to Clements' house, she asked Cumberbatch, whom she had only ever known as "Steve," for his last name. Cumberbatch refused to answer and instead instructed Walker, "Just don't tell anybody my name and where I'm at."[6] (Tr. 347.)

Before long, Cumberbatch turned himself in. While police held Cumberbatch on the murder charge, George Waller, one of Cumberbatch's acquaintances, told Cumberbatch's

---

[5] The medical examiner testified that the wounds were made by a knife at least five inches long.

[6] Walker also testified that she had eaten at McDonald's with Cumberbatch about five or six weeks before the murder. During the meal, Cumberbatch mentioned to Walker that he thought his girlfriend was cheating on him. When Walker suggested that Cumberbatch leave the girlfriend, he said, "Well, no. She don't know what I'm capable of." (Tr. 349.)

4

attorney that Cumberbatch had been at Waller's house during the stabbing. Cumberbatch's attorney wasted no time in filing a notice of alibi to that effect. On the day of trial, however, Cumberbatch's attorney learned that Waller would recant his story on the stand. Indeed, when the Commonwealth put Waller on the stand, he recanted his story, swore that it had been a lie, and explained that Cumberbatch had actually been at his house hours *before* the stabbing, but not while it was taking place.[7] In the middle of Waller's testimony, Cumberbatch's attorney asked for and received a recess, and then moved for a mistrial. Defense counsel argued that Waller's testimony made it appear that the defense had attempted to suborn perjury. To clear up the confusion, he said, he would be forced to testify that Waller had just told him about his lie that very morning. The court took the motion under advisement and allowed Waller's direct examination to continue so that the Commonwealth could establish a timeline showing that the defense attorney had not engaged in any misconduct.

When the Commonwealth rested, Cumberbatch's attorney renewed the motion for a mistrial. The court denied the motion, explained that it was satisfied that Waller's testimony had resolved any confusion, and noted that Waller's credibility was a matter for the jury. The defense then moved to strike the evidence, arguing that the Commonwealth had offered no evidence of premeditation or that Cumberbatch was in fact the murderer. The court denied that motion as well and instructed the defense to present its evidence. The defense began by calling Varry Clark, one of Cumberbatch's friends, who testified that Cumberbatch had stopped by his house at about 9:20 on the night Adkins was stabbed.[8]

---

[7] Cumberbatch also came by Waller's house the next day and asked for a pair of shoes to wear, which Waller provided. According to Waller, Cumberbatch told him he had "messed up and was going to turn himself in." (Tr. 323.)

[8] On cross-examination, the Commonwealth made it fairly clear that Clark may have had his dates and times confused.

5

Cumberbatch himself then took the stand. He testified that he had met Adkins though a mutual friend about eight months before her death, that they called one another often, that he did not carry a knife and did not have a knife in his possession on July 22nd or 23rd, that he did not park across the street from Yolanda Boyd's house on the night of the stabbing, that he had never owned a Bluetooth headset or even put one in his ear, and that he did not kill Karen Adkins. According to Cumberbatch, on the day of Adkins' death he was on his way home from running a cab service (which he did to supplement his unemployment checks) when he noticed Adkins' car at the house on Richmond Avenue. Cumberbatch stopped to find out why Adkins was at a notorious "drug spot," asked her to come outside, talked to her for a few minutes, and left. According to Cumberbatch, he did not call Adkins or see her again that day. Cumberbatch claimed that he had "messed up" his unemployment check and would not get another for a few days, so he drove around attempting to borrow money. He went to his mother's home, then to Waller's, then to Clark's, then to Jerry Smith's, and finally to Clements' home for the night.

Cumberbatch testified that the next morning at Clements' home, he asked for a change of clothes because it was hot and he was sweaty. He testified that he never told Clements or Walker that he had done "something terrible." Rather, he said: "I messed up last night. I messed some money up last night and I need to borrow a few dollars." (Tr. 397.) When Cumberbatch left, he discovered that his vehicle, a black Mercury Mountaineer SUV, was not where he had parked it,[9] and he asked a friend to help him find it. That friend told Cumberbatch about Adkins' murder, and Cumberbatch started to consider turning himself in so that "it didn't appear that [he] did it." (Tr. 400.)

After an aggressive cross-examination by the Commonwealth, the defense rested. The jury found Cumberbatch guilty of second-degree murder and recommended forty years'

---

[9] The police had towed the vehicle because Cumberbatch was a suspect in the murder.

6

imprisonment, which the court imposed. Cumberbatch appealed. On appeal, he claimed (1) that the trial court improperly admitted Adkins' dying declaration; (2) that the trial court should have granted a mistrial either because a new juror had been selected "after jeopardy had attached," because Waller recanted the story that constituted Cumberbatch's alibi, or because Green offered testimony that was inconsistent with things she had told defense counsel before trial; and (3) that there was insufficient evidence to convict him of the murder. The Court of Appeals of Virginia denied the appeal on April 15, 2010. Cumberbatch raised the same issues in the Supreme Court of Virginia, and that court refused Cumberbatch's petition for appeal on October 18, 2010. The next August, Cumberbatch filed a petition for writ of habeas corpus in the Supreme Court of Virginia, asserting two claims for relief:

> A. Counsel unreasonably failed to challenge the prosecution's evidence by not impeaching the prosecution's witnesses during cross-examination, with their prior inconsistent statements, evidence on the record to the contrary, and/or by conducting a simple investigation where the prosecution's witnesses were the only evidence against the petitioner.
>
> B. Counsel labored under a Conflict of Interest.

Petition 1, ECF No. 12-8. The Virginia Supreme Court found that Cumberbatch had not demonstrated either deficient performance or prejudice as to either of his claims, as required by Strickland v. Washington, 466 U.S. 668 (1984), and dismissed his petition. Cumberbatch then filed the instant § 2254 petition in this court.

## II. Adjudicated Claims

Cumberbatch claims that his counsel was ineffective in failing to challenge the Commonwealth's witnesses "with their prior inconsistent statements, evidence on the record to the contrary, and/or by conducting a simple investigation." He further claims that his counsel "labored under a conflict of interest," and that there was insufficient evidence to convict him of

7

murder. The court finds that the state court's adjudication of these claims was not contrary to clearly established federal law or based on an unreasonable determination of the facts. Accordingly, the court dismisses the claims.

Cumberbatch's federal habeas petition is governed by 28 U.S.C. § 2254 and Chapter 154 of the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214, 28 U.S.C. §§ 2261–66 ("AEDPA"). This "federal habeas scheme leaves primary responsibility with the state courts." Cullen v. Pinholster, 131 S. Ct. 1388, 1399 (2011) (internal quotation marks omitted) (quoting Woodford v. Visciotti, 537 U.S. 19, 27 (2002)). Consequently, in almost all circumstances, § 2254 petitioners must exhaust all available state-court remedies before seeking relief in federal court. See 28 U.S.C. § 2254(b). And when a state court has adjudicated a petitioner's habeas claims on the merits, AEDPA requires the federal court to defer to the state court's decision:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d). The state court's factual determinations are also "presumed to be correct," and the petitioner bears the burden of rebutting that presumption by "clear and convincing evidence." § 2254(e)(1).

Under these standards, a state court's adjudication is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme

Court of the United States] on a question of law or if the state court decides a case differently than the [Supreme Court of the United States] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412–13 (2000). A state court's decision unreasonably applies clearly established federal law "if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts." Id. at 413. It is insufficient that a state court applied federal law incorrectly—a federal habeas court may grant relief only if it determines that the state court unreasonably applied federal law. Id. at 411. In making that determination, "a habeas court must determine what arguments or theories could have supported the state court's decision; and then it must ask whether it is possible fair minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." Harrington v. Richter, 131 S. Ct. 770, 786 (2011). Section 2254(d) review, therefore, is limited to the record that was before the state court. Pinholster, 131 S. Ct. at 1398.

A denial of appeal by the Supreme Court of Virginia is "no less an 'adjudication' of the merits of the claim and must be reviewed under the deferential provisions of § 2254(d)(1)." Bell v. Jarvis, 236 F.3d 149, 158 (4th Cir. 2000). "In such cases, [courts] conduct an independent examination of the record and the clearly established Supreme Court law," but must still proceed deferentially and "confine [their] review to whether the [state] court's determination 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" Id. (citations omitted) (quoting Bacon v. Lee, 225 F.3d 470, 478 (4th Cir. 2000)).

## A.

Cumberbatch contends that his counsel was ineffective in failing to impeach the portion of Lily Baggerly's testimony in which she claimed Cumberbatch and Adkins were together "every night." The court finds that the Supreme Court of Virginia reasonably applied controlling federal law to facts it reasonably determined. Accordingly, the court dismisses the claim.

To demonstrate ineffective assistance of counsel, Cumberbatch must show that his counsel's performance was deficient and that the deficiency prejudiced his defense. Strickland, 466 U.S. at 687–91. To establish deficient performance, Cumberbatch must demonstrate that counsel's representation "fell below an objective standard of reasonableness," and he must overcome the strong presumption that counsel acted reasonably. Id. at 688–89. To establish prejudice to his defense, Cumberbatch must demonstrate that, but for his attorneys' alleged errors, there is a reasonable probability that the outcome of the trial would have been different. Id. at 694. A reasonable probability is a "substantial" probability, not just a "conceivable" likelihood of a different result. Harrington, 131 S. Ct. at 792.

When evaluating claims of ineffective assistance of counsel, a federal habeas court may grant relief only if the state-court decision unreasonably applied the more general standard for ineffective assistance of counsel claims established by Strickland. "And, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009). Therefore, the court's review of a Strickland claim under § 2254(d) is "doubly deferential." Id.

Here, Cumberbatch claims that counsel was ineffective because he should have impeached Baggerly's testimony that Cumberbatch and Adkins were together "every night." He asserts that he worked as a truck driver for MJD Trucking and as a satellite technician, which led

to days and nights away from Adkins because of long work hours. As a result, he argues, there is no way he could have spent "every night" with Adkins. When the Virginia Supreme Court evaluated that claim, it held that the record corroborated Baggerly's testimony and that Cumberbatch had failed to demonstrate deficient performance or prejudice. Viewed through AEDPA's deferential lens, that conclusion is not unreasonable. Indeed, if the record does not corroborate Baggerly's trial testimony, it squarely conflicts with Cumberbatch's instant assertion that he was "employed as a truck driver" and as a "satellite technician." At trial, Cumberbatch testified that he was collecting unemployment and supplementing those payments by running a cab service. Even assuming that defense counsel's failure to quibble with Baggerly on this point fell below an objective standard of reasonableness (an assumption that is unwarranted based on the record), there is not a conceivable probability—much less a reasonable probability—that, had defense counsel so proceeded, the outcome of the trial would have been different. Consequently, the Supreme Court of Virginia's adjudication of the claim was not unreasonable, and the court dismisses the claim.

**B.**

Cumberbatch claims that his counsel should have impeached Byron Coles' testimony regarding the numerous, repetitive phone calls Adkins received on the day she was stabbed. He argues that a "simple investigation" would have revealed that Cumberbatch "did not own" the cell phone that repeatedly called Adkins on that day. The Supreme Court of Virginia held that the claim satisfied neither Strickland prong because the trial record in fact demonstrated that Cumberbatch did not own the cell phone, that it belonged to Adkins, and that Coles knew Cumberbatch had been using the phone because Cumberbatch had answered Coles' most recent call to the number. Indeed, Coles testified as to who owned the phone (Adkins), who was likely

11

using it (Cumberbatch), and how he knew that information. Under the circumstances, defense counsel did not need to undertake an investigation to establish ownership of the phone. And because the record shows that defense counsel thoroughly cross-examined Coles about the calls Adkins received on the day of her attack, the court finds that the Virginia Supreme Court reasonably applied Strickland to facts it reasonably determined. Accordingly, the court dismisses the claim.

### C.

Cumberbatch claims that his counsel performed deficiently by failing to impeach Officer Samantha Luck's testimony about the precise moment she arrived on the scene. He further claims that counsel performed deficiently by failing to impeach Luck regarding her accounts of Adkins' dying declarations. Cumberbatch argues that Luck's various statements regarding her arrival on the scene and her conversation with Adkins were inconsistent with one another. The Supreme Court of Virginia held that the claim did not satisfy either Strickland prong because defense counsel *did* cross-examine Luck about the timing of her arrival on the scene, and because Luck did not actually make inconsistent statements about Adkins' dying declarations. The record corroborates the state court's reasoning, and it is difficult to understand how Cumberbatch would have preferred counsel to have approached the issues. The Supreme Court of Virginia did not unreasonably apply Strickland or unreasonably determine facts, and the court dismisses the claim.

### D.

Cumberbatch claims that his counsel performed deficiently by not visiting the murder scene prior to trial to specifically investigate the lighting conditions in the parking lot across the street from Yolanda Boyd and Shannon Green's house (a parking lot where both witnesses

claimed to have seen a heavy-set black male sitting in a black sport utility vehicle while Adkins lay bleeding on their porch). The Supreme Court of Virginia found that Cumberbatch had failed to demonstrate that counsel's performance was deficient or that there was a reasonable probability that, but for counsel's alleged unprofessional error, the outcome of the proceeding would have been different. The state court explained that counsel cross-examined Boyd and Green about the lighting and their ability to see across the street and into the vehicle, introduced photographs of the lighting in the parking lot, questioned one of the police witnesses about the lighting, and argued the weakness of Boyd's and Green's identifications in closing argument. The state court noted that Cumberbatch had failed to explain what additional information counsel might have elicited had he visited the murder scene at night to investigate the lighting. Given defense counsel's repeated emphasis on the poor lighting conditions, and given that Cumberbatch leaves alternative strategies open to rank speculation, this court finds that the Virginia Supreme Court's adjudication of the claim was not unreasonable. Accordingly, the court dismisses the claim.

E.

Cumberbatch claims that his counsel performed deficiently by failing to impeach Tammy Walker on the portion of her testimony in which she claimed Cumberbatch said he had "done something terrible." Cumberbatch asserts that Walker's testimony was vulnerable because Gerald Clements, who was also present during the conversation, did not say that he heard the statement, and because Walker did not know Cumberbatch very well. The Virginia Supreme Court held that Cumberbatch had failed to establish deficient performance or prejudice under Strickland because the trial testimony established precisely those things Cumberbatch says his counsel failed to establish. Indeed, it appears plain from the trial testimony that Walker and

13

Cumberbatch were mere acquaintances, and that Clements did not hear Cumberbatch say he had "done something terrible." Because the Supreme Court of Virginia reasonably applied controlling law to facts it reasonably determined, the court dismisses the claim.[10]

### F.

Cumberbatch claims that counsel provided ineffective assistance because he labored under a "conflict of interest." Specifically, Cumberbatch claims that, because counsel's wife was sick before and during trial, counsel was not prepared for trial. In evaluating that claim, the Supreme Court of Virginia held that Cumberbatch had failed to establish either an actual conflict of interest or that counsel's family affairs led to any deficient performance by counsel or prejudice to Cumberbatch. Because the Supreme Court of Virginia correctly applied controlling precedent to facts it reasonably determined, the court dismisses the claim.

"[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. Cuyler v. Sullivan, 446 U.S. 335, 349–50 (1980) (citing Holloway v. Arkansas, 435 U.S. 475, 487–491 (1978)). "But until a defendant shows that his counsel *actively represented conflicting interests*, he has not

---

[10] The court notes that not all aspects of Cumberbatch's first ground for relief directly parallel his state habeas petition. Cumberbatch claims here (but did not claim in state court) that counsel made no attempt to impeach Waller's contradicting statements about Cumberbatch's alibi, and that counsel failed to mention a complaint that Adkins lodged against Cumberbatch for domestic assault and battery, which happened to mention that Adkins and Cumberbatch were no longer dating. See Petition 11, ECF No. 1-3 ("Steven Cumberbatch and I was dating and broke up a couple of wks. Ago and he been acting very mean to me. On Friday he came to home accusing me of cheating on him while my 3 little girls and I was getting our hair done at home. He returned on Sat. 28 he came by and when I opened the front door he punched me in my chest and slapped me."). To the extent Cumberbatch intends to present those claims as distinct from his other claims, they are unexhausted. See 28 U.S.C. § 2254(b) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State."); Picard v. Connor, 404 U.S. 270, 277 (1971) (explaining that, to exhaust a claim, a state habeas petitioner must fairly present the substance of his claims to state courts, including the legal grounds of his complaint and the underlying facts).

established the constitutional predicate for his claim of ineffective assistance." Id. at 350 (emphasis added) (citing Glasser v. United States, 315 U.S. 60, 72–75 (1942)).

Here, Cumberbatch has shown that a member of defense counsel's family was sick before and during Cumberbatch's trial. Nothing about that showing establishes that counsel actively represented competing interests. Neither has Cumberbatch established that counsel performed deficiently. The trial transcript shows that counsel was prepared for trial, reasonably argued an important motion in limine, cross-examined every witness, re-cross-examined certain witnesses, questioned Cumberbatch at length to establish an alternative narrative, and argued the weaknesses of the Commonwealth's case in an attempt to establish reasonable doubt. Though the jury found Cumberbatch guilty, it is likely that defense counsel's efforts paid appreciable dividends in the form of the second-degree, rather than first-degree, guilty verdict, in spite of the murder victim's twenty-three stab wounds. Under the circumstances, Cumberbatch has made no showing that, had counsel's wife not been sick, counsel would have performed better or differently, and no showing that, had counsel performed better or differently, there is a reasonable probability that the outcome of the trial would have been different. Viewed through AEDPA's deferential lens, the Supreme Court of Virginia's decision on this claim is unassailable. Accordingly, the court dismisses the claim.

## G.

Cumberbatch contends that there was insufficient evidence to convict him of murder.[11] Because a rational trier of fact could have found the essential elements of second-degree murder, the court dismisses the claim.

---

[11] In considering the sufficiency of the evidence, the Court of Appeals of Virginia found that
[t]he victim died from twenty-three sharp force injuries resulting in acute blood loss. Two witnesses testified that the victim stated appellant or her "boyfriend" had attacked her. Another witness identified appellant as the man she saw sitting in a truck across the street (near

15

Federal habeas review of a claim challenging the constitutional sufficiency of the evidence supporting a conviction is limited to determining "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). In determining whether the state court reasonably applied this principle, the federal habeas court must determine whether the state court's decision is minimally consistent with the record, Bell v. Jarvis, 236 F.3d 149, 159 (4th Cir. 2000) (en banc), and must give deference to the findings of fact made by both the trial and appellate courts, 28 U.S.C. § 2254(d); Howard v. Moore, 131 F.3d 399, 406 (4th Cir. 1997) (citing Sumner v. Mata, 449 U.S. 539, 546–47 (1981)). The federal court does not weigh the evidence or consider the credibility of witnesses. United States v. Arrington, 719 F.2d 701, 704 (4th Cir. 1983).

Viewing the evidence in the light most favorable to the Commonwealth, a rational trier of fact could have found the essential elements of second-degree murder.[12] Indeed, given Adkins' twenty-three stab wounds and the circumstantial evidence tying Cumberbatch to the murder, a rational jury could have found the essential elements of *first*-degree murder. Trial testimony

---

the scene of the crime) when the bloodied victim appeared at her door asking for help. The jury also heard evidence that during most of the time appellant and the victim dated, appellant consistently questioned the victim's whereabouts. A witness testified that on the day after the victim was killed, appellant said he needed money to get out of town, stating, "I did something, f'd up. I did something terrible." However, appellant would not say what he had done. Appellant also asked for a change of clothes.

Tammy Walker testified that about five or six weeks before the incident, appellant told her he was concerned the victim was "messing with" someone else. Walker also testified that appellant said about the victim, "She don't know what I'm capable of." [George] Waller testified that on the date after [sic] the victim was killed, appellant told him, "he had messed up and he was going to turn himself in." Appellant also asked Waller for a pair of shoes, and appellant left his shoes at Waller's residence.

Although appellant testified at the trial that he did not kill the victim, the jury was not required to accept appellant's testimony. . . . From the Commonwealth's evidence, the jury could conclude beyond a reasonable doubt that appellant committed second-degree murder.

Cumberbatch v. Commonwealth, No. CR08-1094 (Va. Ct. App. 2009); Ex. D. 5–6, ECF No. 12-5.

[12] In Virginia, "[k]illing with malice but without premeditation and deliberation is murder of the second degree." Perricllia v. Commonwealth, 229 Va. 85, 91 (1985); see also Va. Code § 18.2-32.

16

showed that Cumberbatch and Adkins had a rocky relationship; that he suspected her of infidelity; that, in her dying moments, Adkins told two people that Cumberbatch had stabbed her; that witnesses saw a vehicle similar to Cumberbatch's vehicle near the crime scene with a driver fitting Cumberbatch's description; and that Cumberbatch made incriminating statements, asked for a change of clothes, and behaved oddly on the day after the murder. Therefore, the state court's decision was consistent with the record, and its adjudication was not contrary to clearly established federal law nor based on an unreasonable determination of the facts. See Bell, 236 F.3d at 158 (noting that a denial of appeal by the Supreme Court of Virginia is "no less an 'adjudication' of the merits of the claim and must be reviewed under the deferential provisions of § 2254(d)(1)."). Accordingly, the court dismisses the claim.

### III. State-law Claims

In his remaining claims to relief, Cumberbatch claims that (1) the trial court should have declared a mistrial when Waller recanted the story that constituted Cumberbatch's alibi, (2) the trial court should have declared a mistrial when Green gave testimony that was inconsistent with statements she gave before trial, and (3) the trial court improperly admitted Adkins' dying declaration. The court dismisses the claims because they are not cognizable in habeas.[13]

---

[13] In addition, Cumberbatch claims that the trial court should have declared a mistrial "in view of the fact that the selection of a new juror after jeopardy had attached was done improperly, unconstitutionally and against the ends of justice." Petition 11, ECF No. 1. The Court of Appeals of Virginia held that it would not consider the issue because Cumberbatch had not lodged a contemporaneous objection at trial (as Rule 5A:18 of the Rules of the Supreme Court of Virginia requires), and because the circumstances did not require that it invoke the "ends of justice" exception to Rule 5A:18. "A habeas petitioner is barred from seeking federal review of a claim that was presented to a state court and 'clearly and expressly' denied on the independent, adequate state ground of procedural default," Bennett v. Angelone, 92 F.3d 1336, 1343 (4th Cir. 1996) (citing Harris v. Reed, 489 U.S. 255, 263 (1989); Caldwell v. Mississippi, 472 U.S. 320, 327 (1985)), unless the petitioner "can show cause for the default and demonstrate actual prejudice as a result of the alleged violation of federal law, or prove that failure to consider the claims will result in a fundamental miscarriage of justice," Lawrence v. Branker, 517 F.3d 700, 714 (4th Cir. 2008) (quoting McCarver v. Lee, 221 F.3d 583, 588 (4th Cir. 2000)). Because the Court of Appeals of Virginia clearly and expressly denied the claim on the independent and adequate procedural ground of Rule 5A:18 and the Supreme Court of Virginia denied Cumberbatch's appeal on the issue, and because Cumberbatch has demonstrated neither cause, prejudice, nor a miscarriage of justice, the claim is procedurally defaulted. See, e.g., King v. Dean, 955 F.2d 41 (4th Cir. 1992) (table) (noting that a habeas petitioner's claims were procedurally barred due to the petitioner's

"The habeas statute unambiguously provides that a federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" Wilson v. Corcoran, 131 S. Ct. 13, 16 (2010) (citing 28 U.S.C. § 2254(a)). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) (citing 28 U.S.C. § 2241; Rose v. Hodges, 423 U.S. 19, 21 (1975)). Here, Cumberbatch claims that the trial court should have declared a mistrial when Waller and Green gave testimony that differed from what defense counsel expected, and he claims that the trial court improperly admitted Adkins' dying declaration. If any errors lie in those claims, Cumberbatch has presented them as errors of state law, and not as violations of the Constitution, laws, or treaties of the United States. Accordingly, the claims are not cognizable in habeas and the court dismisses them.

### IV.

For the reasons stated, the court grants the respondent's motion to dismiss.[14]

**ENTER:** March 27, 2013.

UNITED STATES DISTRICT JUDGE

---

failure to object in the trial court, as Rule 5A:18 requires); Makdessi v. Watson, 682 F. Supp. 2d 633, 650 (E.D. Va. 2010) ("The Court of Appeals of Virginia found this claim barred by Virginia Supreme Court Rule 5A:18 because Petitioner failed to 'preserve his constitutional argument with a specific, contemporaneous objection that his due process rights to a fair trial were violated.' Rule 5A:18 constitutes an adequate and independent ground for denying a claim." (citation omitted) (citing Clagett v. Angelone, 209 F.3d 370, 378 (4th Cir. 2000))).

[14] Cumberbatch has filed a motion to amend his petition. He seeks to add a claim that he was denied the right to an impartial jury because a member of the jury said during voir dire that he did not know Adkins, even though the jury list shows that the juror lived on the same street as Adkins. Cumberbatch speculates, based solely on the fact that the juror and Adkins lived on the same street, that the juror was lying and actually knew Adkins. The claim is frivolous and defaulted, amendment would be futile, and the court denies the motion.